UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HEATHER GIRARD,

    Plaintiff,

v.

LINCOLN COLLEGE OF NEW ENGLAND,

    Defendant.

No. 3:12-cv-00703 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

Plaintiff, a former student at Lincoln College,[1] filed a complaint on April 11, 2012, alleging various claims, including that Defendant violated the Americans with Disabilities Act and the Rehabilitation Act of 1973 by failing to reasonably accommodate Plaintiff's disability while she was enrolled as a student [Doc. # 1]. Defendant has filed a Motion for Summary Judgment [Doc. # 53] on the remaining counts of the Amended Complaint [Doc. # 37], which, following an earlier order granting in part Defendant's Motion to Dismiss [Doc. # 49], are Counts One, Two, Five, and Six. Familiarity with the allegations in the underlying complaint and evidence in the record is assumed for purposes of this decision.

Because I find that the record contains sufficient evidence to raise a genuine issue of material fact as to Plaintiff's claim under Section 504 of the Rehabilitation Act, the Motion for Summary Judgment is DENIED as to that claim. Summary judgment is GRANTED as to all remaining claims. In particular, summary judgment is granted on the Americans with

---

[1] The school was known as Briarwood College at the time Plaintiff matriculated in the fall of 2008. Briarwood College was acquired by Lincoln College in December of 2008, at which time Plaintiff attended the school. (Def.'s Mem. in Support of Summary Judgment [Doc. # 53] at 5.)

Disabilities Act claim because the portion of the statute applicable to Plaintiff, Title III, affords only injunctive relief, and any request for such relief would be moot due to the fact that Plaintiff has left Lincoln College and has shown no desire or intent to return; summary judgment is granted on the breach-of-contract claim because the only promises as to which the record supplies evidence of breach are not supported by consideration; and summary judgment is granted on the claim for intentional infliction of emotional distress because the only conduct that might fit that description was an intentional tort by the Defendant's employee for which the Defendant is not vicariously liable.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). Summary judgment is appropriate if, after discovery, the nonmoving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Id.* at 323.

## III.   DISCUSSION

### A. Count One – Title III of the ADA

Count One alleges that Defendant failed to provide Plaintiff with a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, *et seq.* Although the Amended Complaint does not specify under which title of the ADA Plaintiff brings her claim, because she has asserted claims against a private university, it appears

that that the only applicable title is Title III, which is entitled "Public Accommodations and Services Operated by Private Entities."  *See* 42 U.S.C. § 12189 ("Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.").  Title I applies to employment, *see* 42 U.S.C. § 12112(a), and Title II applies to "public entities," *see* 42 U.S.C. § 12132, neither of which are at issue here.  Thus, Plaintiff's claim arises under Title III of the ADA.

It is well-settled in the Second Circuit that Title III of the ADA allows only for injunctive relief, not damages.  *Brief v. Albert Einstein College of Medicine*, 423 F. App'x 88, 90 (2d Cir. 2011).  Here, it is undisputed that Plaintiff no longer attends Lincoln College and is currently enrolled in a program at a different university.  There is no evidence in the record that Plaintiff has any intent or desire to return to Lincoln College.  Further, Count One of Plaintiff's Amended Complaint does not even seek injunctive relief.  Accordingly, Plaintiff's claim under Title III of the ADA is moot.  *Id.* (finding plaintiff's claim against medical school under Title III of the ADA moot where plaintiff had graduated from medical school, received his M.D., and was participating in a residency program).  Summary judgment is therefore GRANTED as to Count One.

      **B.  Count Two – Section 504 of the Rehabilitation Act**

Count Two alleges that Defendants failed to provide Plaintiff with a reasonable accommodation in violation of Section 504 of the Rehabilitation Act ("the Act").  Section 504 of the Act, which applies to programs receiving federal financial assistance, states that "'[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under' any covered program or activity." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (quoting 29 U.S.C. § 794(a)).  Defendant does not contest that Section 504 applies to it but argues that Plaintiff's Rehabilitation Act claims cannot survive summary judgment for several other reasons.  As discussed below, I disagree.

To establish a prima facie violation under Section 504, a plaintiff must demonstrate that: (1) she is a "qualified individual" with a disability; (2) the defendant is subject to Section 504; and (3) she was "denied the opportunity to participate in or benefit from defendant['s] services, programs, or activities, or [was] otherwise discriminated against by defendant[], by reason of [her] disability." *Id.* (internal quotation marks omitted).  With respect to the third element, a plaintiff may base a disability discrimination claim on the theory that the defendant failed to make a reasonable accommodation.  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).  Unlike Title III of the ADA, the Act does allow for the recovery of damages.  In order to recover damages, however, Plaintiff must show that the statutory violation resulted from "deliberate indifference" to the rights secured by the Act.  *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001).

### 1.  Whether Plaintiff is Disabled

Plaintiff's Rehabilitation Act claim is based on a reasonable accommodation theory.  Defendant argues that this claim fails because Plaintiff cannot establish the first prong of the *prima facie* case, *i.e.*, that she was disabled within the meaning of the Act.  For purposes of this case, the definition of "disability" in the Act is taken from the ADA's definition in 42 U.S.C. § 12102.  *See* 29 U.S.C. § 705(9) ("The term 'disability' means—(B) for purposes of subchapters . . . V . . . of this chapter [which includes § 794 – Nondiscrimination Under Federal Grants and

Programs] . . . the meaning given in section 12102 of Title 42."); *see also Shaywitz v. Am. Bd. of Psychiatry and Neurology*, 848 F. Supp. 2d 460, 467 n.4 (S.D.N.Y. 2012) ("The Second Circuit applies the same standard to the Rehabilitation Act and Title III of the ADA."). Thus, the relevant definition of disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. Plaintiff claims that she suffers from auditory processing disorder, and that this impairment substantially limits her ability to learn, think, hear, concentrate, and speak.[2] Defendant does not dispute that Plaintiff suffers from an "impairment" or that learning, thinking, hearing, concentrating, and speaking constitute "major life activities" within the meaning of the statute. Instead, Defendant argues that Plaintiff cannot establish that her auditory processing disorder "substantially limits" her ability to learn, think, hear, concentrate and speak. In light of the evidence in the record and the ADA Amendments Act of 2008 ("ADAA"), I disagree, and find that Plaintiff has at least raised a genuine issue of material fact on this point.

The ADAA "substantially broadened the definition of 'disability' under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mftrg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining 'disability' had been strictly defined." *Hutchinson v. Ecolab, Inc.*, 2011 WL 4542957, at *7 (D. Conn. Sept. 28, 2011). In particular, the ADA now states that the definition of disability shall be "construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms

---

[2] Although Plaintiff seems to argue in her opposition brief that her anxiety also constituted a disability under the Act, Plaintiff testified in her deposition that she never identified it to Lincoln as a disability and never requested accommodations for it. (Pl.'s Depo. Tr. at 101 ("Q: Did you ever identify to the college that you had an anxiety related disability? A: No, because I never thought of it as a disability because I never went to the doctor for it."). Thus, Plaintiff's alleged anxiety cannot form the basis of her claim under the Act. *Cf. McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F3d 92, 97 (2d Cir. 2009) (listing the defendant's "notice of [the] disability" as an element of the *prima facie* case under the ADA); *see also Thompson v. City of New York*, (S.D.N.Y. Dec. 9, 2002) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations" (quoting *Beck v. Umv. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996))).

of this chapter" and that the term "substantially limits" shall be "interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." 42 U.S.C. § 12102(4)(A), (B). The "findings" of the ADAA include, but are not limited to: (1) that the Supreme Court in *Sutton* "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect," (2) that the Supreme Court in *Toyota* "interpreted 'substantially limits' to require a greater degree of limitation than was intended by Congress," and (3) that, "as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities." *See* ADAA, Sec. 2(a)(4), (6), (7), Pub. L. 110–325, 122 Stat. 3553 (2008). The "purposes" of the ADAA include, but are not limited to: (1) "to carry out the ADA's objectives . . . by reinstating a broad scope of protection to be available under the ADA," (2) "to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and (3) "to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *See id.* Sec. 2(b)(1), (5).

Plaintiff's deposition testimony provides enough evidence to make the question whether she has a disability under these relaxed standards one for the jury. Plaintiff testified—and Defendant does not dispute—that she has been diagnosed with auditory processing disorder ("ADP"). According to Plaintiff, ADP makes it difficult to process and understand information being conveyed to her, affects her ability to concentrate by leading her to focus on background noise rather than the information being conveyed to her, and affects her ability to communicate and convey her thoughts. (Pl.'s Depo. Tr. [Doc. # 66-3] at 20-21, 29-37, 46-47, 89-92.) Thus,

ADP affects Plaintiff's ability to learn, think, hear, concentrate, and speak. (*Id.*) In addition, Plaintiff testified that she had difficulty in elementary school and was held back in first grade. (*Id.* at 17-18.) She was provided with learning accommodations in elementary school, middle school, and high school. Such accommodations included, but were not limited to, access to extra help, quiet test-taking facilities, and exam questions stated in a "broken down" way. (*Id.* at 30-37.) In high school, the principal and guidance counselor held "504 meetings" throughout the year with Plaintiff's parents. (*Id.* at 36.) Plaintiff's guidance counselor and the administration at her high school also created a "504 Accommodation Plan" for Plaintiff to provide to her college upon admission. (*Id.* 45-46.) Although the 504 Accommodation Plan has not been provided to the Court as an exhibit, it appears from Plaintiff's deposition testimony that the plan describes how Plaintiff's APD affects the major life activities of learning and thinking. (*See id.* at 46-49.)

Despite this evidence, Defendant argues that Plaintiff has failed to establish that her ADP "substantially limits" any major life activity because: (1) Plaintiff testified that she can "overcome" some of her limitations using certain strategies such as asking people to repeat themselves, taking breaks from studying, and blocking out background noise; (2) Plaintiff maintained an above-average GPA at Lincoln despite requesting accommodations in only five of the twenty-three courses she was enrolled in; and (3) Plaintiff does not require accommodations at her new school. (Def.'s Mem. at [Doc. 54] at 19.) I disagree that these circumstances require me to find, as a matter of law, that Plaintiff's impairment does not substantially limit her ability to learn, think, hear, concentrate, and speak.

The first argument is without merit because under the ADA's new definition of disability, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . learned

7

behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i).  Indeed, one of the stated purposes of the ADAA was "to reject the requirement enunciated by the Supreme Court in [*Sutton*] . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures."  122 Stat. 3553, Sec. 2(b); *see* 42 U.S.C. § 12102(4)(B) (requiring courts to interpret term "substantially limits" in accordance with findings and purposes of ADAA).  Because Plaintiff's study strategies are "learned behavior" modifications, I cannot consider them in determining whether Plaintiff's ADP substantially limits a major life activity.

The other two arguments, though they may be relevant, are not dispositive.  On the one hand, the fact that Plaintiff did not request accommodations in several classes and nevertheless managed largely to succeed, and the fact that she has succeeded without accommodations in her current program, may suggest that she is not substantially limited in her ability to learn, think, hear, concentrate, and speak.  On the other hand, when viewing the evidence in a light most favorable to Plaintiff—as I must do on a motion for summary judgment—it is equally likely that Plaintiff's success in classes where she did not request an accommodation is due to the strategies she used to overcome her learning disability, and that in the critical exam-review class in which she requested an accommodation and, as discussed below, it was not adequately provided, her learned strategies were insufficient to counteract the effects of her disability.  (*See* Pl.'s Depo. Tr. [Doc. # 66-3] at 90-91 (discussing the ways in which she tries to overcome her limitations).) The fact that Plaintiff's impairment prompted a request for accommodation in a minority of classes, and proved to be an insurmountable obstacle in only one class in which an adequate accommodation was not provided does not, as a matter of law, mandate a finding that the impairment did not substantially limit Plaintiff.  Moreover, Plaintiff testified that the classrooms

at her new school, and some of the classrooms at Lincoln, simply were not as distracting as the classrooms for which she requested accommodations, which suggests only that no accommodation was necessary in those cases. (*Id.* at 82, 186) ("[T]he [new] school is extremely good about having quiet. . . . it's quiet in the room. I don't feel I need to go to any other room with this school."). Most importantly, resolution of this question must be guided by the clear congressional intent expressed in the ADAA. In light of the ADAA's findings and purposes, which are set forth in part above and must be considered in determining whether a person is "substantially limited," I find that the evidence in the record raises a genuine issue of material fact as to whether Plaintiff's ADP substantially limits her in any major life activity, her partial success in overcoming her disability without accommodation notwithstanding.

A case relied on by Defendant—*Rumbin v. Assoc. of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011)—is distinguishable from this case. First, *Rumbin* was decided following a bench trial, not on a motion for summary judgment. *See id.* at 85. Second, the undisputed evidence in *Rumbin* showed that objective measures of the plaintiff's vision were "on the cusp of normal" and "within normal range"; by contrast, in this case there is evidence that Plaintiff's ADP condition has disadvantaged her throughout her academic career. *Id.* at 94. Third, it does not appear that the Court in *Rumbin* expressly considered the findings and purposes of the ADAA. *See id.* at 93-94; *see also* 92 n.4 (finding that the ADAA applied to some of plaintiff's claims but focusing on the portion of the amended disability definition relevant to vision). Accordingly, I do not find *Rambin* to be a useful guide in this case, notwithstanding that decision's partial reliance on the plaintiff's success in the absence of accommodations. *See id.* at 95.

In sum, given the entirety of the factual record in this case construed in a light most favorable to Plaintiff, as well as the statutory mandate to interpret the definition of "disability" broadly, I find that Plaintiff has at least raised a genuine issue of material fact as to whether she is "disabled."

### 2. Whether Plaintiff "Abandoned" her Rehabilitation Act Claim

Defendant also argues that Plaintiff "abandoned" her failure-to-accommodate claim when she "failed to communicate any alleged deficiencies in her accommodations" and "simply left Lincoln after failing her seminar for a third time." (Def.'s Mem. [Doc. # 54] at 20.) Defendant cites no authority for the proposition that a plaintiff is required to have discussions with a defendant regarding failed accommodations before filing suit, and the cases cited by Defendant on this issue are inapposite. For example, *Shaywitz v. Am. Bd. of Psychiatry and Neurology*, 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012) discusses the requirement that a defendant have adequate knowledge of the plaintiff's disability; here, there is no dispute that Defendant had adequate knowledge of Plaintiff's ADP. *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 100 (2d Cir. 2009), simply holds that the failure to engage in the "interactive process" of determining whether accommodations will be provided cannot form the basis of an ADA claim if no accommodation was possible; whether an accommodation was possible in this case is not at issue. To be sure, there are cases discussing the "interactive process" required in determining what limitations a person has, whether any accommodations will be granted, and if so, what accommodations are reasonable. *See, e.g.*, *Festa v. Bd. of Ed.*, 145 Conn. App. 103, 115 (2013). But here, the record indicates that the parties did engage in such an interactive process, and that, as a result of that process, Defendant determined that Plaintiff would be provided with two accommodations: (1) extended test time, and (2) a non-distracting test-taking environment.

10

Defendant has provided no authority for extending the required interactive process to the period *following* a failed attempt to provide an agreed-upon accommodation. Further, the Court is unaware of any rule requiring a plaintiff to re-open the dialogue after the defendant has failed to deliver a promised accommodation in an adequate manner. In the absence of such authority, the Court declines to create such a barrier to Rehabilitation Act claims.

### 3. Whether Plaintiff Received Reasonable Accommodations

Next, Defendant argues that Plaintiff cannot show that a reasonable accommodation was denied to her because Lincoln "provided all accommodations requested by Plaintiff." (Def.'s Mem. [Doc. # 54] at 21-22.) I disagree, and find that a genuine issue of material fact exists as to whether Defendant denied Plaintiff reasonable accommodations. As noted above, the record indicates that Defendant agreed to provide Plaintiff with two accommodations: (1) extended test-taking time, and (2) quiet, non-distracting test-taking facilities. Defendant does not argue that, assuming Plaintiff was disabled, the agreed accommodations were unreasonable or inappropriate. Thus, the question is whether the agreed accommodations were actually provided.

Plaintiff testified to the presence of significant distractions on two of the three occasions that she took the seminar exam. (Pl.'s Depo Tr. [Doc. # 66-3] at 94, 107-09, 183; *see also id.* at 164, 168, 171.) On one occasion, Plaintiff was permitted to take her seminar exam in the office of a professor, Anne Chepulis. (*Id.* at 107-08.) Plaintiff testified that, while she was taking the exam, there was a pot of coffee brewing next to her and that she could hear Dr. Warren, whose office was next door, "laughing, giggling, talking very loud." (*Id.* at 94.) She also testified that Ms. Chepulis "would go in and out of the room to talk to Mr. Warren," and that "it was more distracting . . . than taking [the exam] in the classroom." (*Id.*) Plaintiff failed the exam.

Plaintiff testified that, on the third occasion she took the seminar exam, she took it in a classroom instead of a professor's office. (*See id.* at 162.) According to Plaintiff, "there was a party next door for the dental students, so it wasn't quite like promised," and that "Anne Chepulis kept coming downstairs so Dr. Warren could leave, so [there were] distractions of him going in and out of the classroom." (*Id.* at 164.) Plaintiff testified that "the distractions" were part of the reason that she failed the exam for a third time. (*Id.* at 168.) In response, Defendant argues that Plaintiff was given the opportunity to take the third exam in an instructor's office but instead chose to take it in the classroom. But the record indicates that Plaintiff chose to take the exam in a classroom after: (1) discussing with the Associate Dean of Student Services, Cynthia Clark, "the pros and cons" of taking the test in an office versus the regular classroom, and (2) receiving assurance from Dr. Warren and Dean Clark that the classroom would not be distracting. (*Id.* at 162.) As discussed above, the latter proved to be untrue, at least according to Plaintiff's testimony. Moreover, the record is not clear as to what the "pros and cons" were that Plaintiff discussed with Dean Clark. (*Id.*) There is a reference in Plaintiff's deposition to a "little meeting" in Dean Clark's office that "might cause a little distraction" as being the reason Plaintiff decided to take the exam in the classroom. (*Id.* at 163.) Construing the record in the light most favorable to Plaintiff, it is possible that one of the "cons" of taking the exam in a professor's office was that it could be as distracting as a classroom, as it was when Plaintiff took it in Ms. Chepulis's office. Given this evidence, I cannot conclude as a matter of law that Plaintiff voluntarily surrendered a right to a non-distracting test-taking facility by electing to take the test in the classroom as opposed to a professor's office.

A reasonable fact-finder could conclude from this evidence that Plaintiff did not receive one of the two promised reasonable accommodations—a non-distracting test environment—on at

least two occasions. The record also indicates that Lincoln's policies allow students to take the seminar exam a second time if they do not pass on the first attempt. (*Id.* at 85.) Because a reasonable fact-finder could conclude that Plaintiff received, at most, only one accommodated exam, it could also conclude that, in effect, Plaintiff was denied the privilege of taking the exam twice. Thus, there is a genuine issue of material fact as to whether Plaintiff was denied a reasonable accommodation to which she was entitled.

I note that Plaintiff also appears to argue that Defendant violated the Act by not: (1) providing Plaintiff with additional explanation of class material, (2) placing Plaintiff in the front of the classroom, (3) speaking slowly enough for Plaintiff to understand, and (4) parsing out test questions to make them comprehensible to Plaintiff. (*See* Pl.'s Mem. [Doc. # 66-1] at 40.) Although Defendant does not dispute that it limited the accommodations to the two already discussed, Plaintiff testified in her deposition, repeatedly and unequivocally, that she did not need any accommodations other than the two that Defendant initially agreed to provide. (Pl.'s Depo. Tr. [Doc. # 66-3] at 73, 89.) Having unequivocally conceded in her deposition that the other accommodations were unnecessary, and having failed to point to any evidence that they were necessary, she cannot now claim that they were unlawfully denied. *Cf. Newport Electronics, Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 220 (D. Conn. 2001) ("The settled law in the Second Circuit is that a party may not create a material issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (internal citations and quotation marks omitted)).

### 4. Whether Defendant Acted with Deliberate Indifference

Finally, Defendant argues that Plaintiff has failed to produce sufficient evidence to establish that Defendant acted with deliberate indifference towards Plaintiff's rights under the

Act. (Def.'s Mem. [Doc. # 54] at 29.) In order to recover monetary damages under the Rehabilitation Act—as Plaintiff seeks to do in this case—a plaintiff must prove that the defendant acted with "deliberate indifference" to her rights guaranteed under the Act. *Loeffler v. Staten Island University Hospital*, 582 F. 3d 268, 275 (2d Cir. 2009). The Second Circuit has suggested that, in this context, deliberate indifference requires that "[a]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf ha[ve] actual knowledge of discrimination in the recipient's programs and fail[] to adequately respond." *Id.* at 275-76. The Second Circuit has also said that deliberate indifference "must be a deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at 276.

The Second Circuit's analysis of the facts in *Loeffler* is instructive. In *Loeffler*, the plaintiffs appealed a district court's order granting summary judgment on their claim that the defendant, a hospital, failed to reasonably accommodate their hearing loss. *Id.* at 274. The district court had granted summary judgment in part because it found no genuine issue of material fact as to whether the defendant had been deliberately indifferent. *Id.* The district court's conclusion was based on its finding that the hospital had a system in place to provide interpretive services and the employees "made numerous good-faith, though unfortunately unsuccessful, efforts to obtain an interpreter." *Id.* at 276. The Second Circuit reversed, finding that the evidence in the record was sufficient to support a finding of deliberate indifference. In reaching this conclusion, the Court of Appeals noted that, although there was evidence that some of the hospital employees made efforts to obtain an interpreter, the plaintiffs made several attempts to secure an interpreter that went unheeded. *Id.* at 276. In addition, there was evidence that one doctor "laughed off" the plaintiffs' request for an interpreter. *Id.* at 276-77. The Second

Circuit concluded that, although there were "certainly facts in the record that might lead a reasonable jury to conclude that the Hospital was not deliberately indifferent," "taken together," the evidence—including the "shortcomings" in the hospital's conduct and the "alleged apathetic response"—would allow a jury to find deliberate indifference, *i.e.*, to find that "persons at the Hospital had actual knowledge of discrimination against the Loefflers, had authority to correct the discrimination, and failed to respond adequately." *Id.* at 276-77.

Here, as discussed above, Plaintiff testified that her test-taking environment was distracting on at least two of the three occasions on which she took the seminar exam. On one occasion, the environment was distracting in part because she could hear Dr. Warren talking loudly outside of Ms. Chepulis's office. (Pl.'s Depo. Tr. [Doc. # 66-3] 94.) Plaintiff testified that Dr. Warren knew she was taking the test in the office at the time because "he's the one that told [her] to take it in that room." (*Id.* at 107-08.) Further, Plaintiff testified that, although Ms. Chepulis asked Dr. Warren to quiet down once, "[h]e quieted down for maybe five minutes and then it was back up and he knew [she] was in the room." (*Id.* at 108.) Ms. Chepulis would then ask Plaintiff "if it was okay," Plaintiff would say "no, it's still loud," but "nothing ever got, nothing got done." (*Id.*)

On another occasion, Plaintiff took the seminar exam in a classroom and a group of dental students was having a party in an adjacent room. (*Id.* at 164.) As discussed above, there is some suggestion in the record that Plaintiff chose to take the exam in the classroom because Ms. Clark would be having a "little meeting" in her office, and because Dr. Warren assured her the classroom would be non-distracting. (*Id.* at 162-63.) Plaintiff testified that the classroom became loud because of the dental students' party next door. (*Id.* at 164.) She looked up at Dr. Warren and pointed to the room next door, at which point Dr. Warren told the dental students

that "[t]hey are taking the exam." (*Id.* at 168.)  According to Plaintiff, the students quieted down "for a little" but then the noise "[w]as the same as it was when he had asked people to be quiet.  It got the same."  (*Id.* at 171.)  Viewed in a light most favorable to Plaintiff, the summary judgment record would permit a reasonable jury to conclude that Ms. Chepulis, Ms. Clark, and Dr. Warren were aware that the accommodations fell short of guaranteeing Plaintiff a quiet test-taking environment, and did not do enough to address this problem.

Moreover, Plaintiff testified to remarks by Dr. Warren that were similar to the defendant's conduct in *Loeffler*.  In particular, Plaintiff testified to the following comments: (1) Dr. Warren stated, "Oh, I don't know what this is going to do to help" when Plaintiff requested accommodations (*id.* at 97), (2) Dr. Warren stated, "You didn't study" and "you obviously weren't putting your effort into it" (*id.* at 139), and (3) Dr. Warren stated, "If you can't make it through this school, you can't make it through any other school" (*id.* at 140.)  Each of these comments suggests that Dr. Warren was dismissive of Plaintiff's alleged disability.  Taken together and viewed in a light most favorable to Plaintiff, this evidence is sufficient to raise a genuine issue of material fact as to whether Plaintiff's professors knew of the inadequate accommodations and failed to adequately respond, *i.e.*, whether they were "deliberately indifferent" to Plaintiff's entitlement to a quiet place to take her exams.

For all of the foregoing reasons, summary judgment as to Count Two is DENIED.

### C.  Count Five – Breach of Contract

Count Five alleges a breach of contract claim.  The basis of the claim appears to be an alleged agreement negotiated by Dean Kiernan and Merle Harris, an educational consultant retained by Plaintiff and acting on her behalf.  According to Plaintiff, it was agreed that: (1) Plaintiff could take the seminar exam in a quiet, non-distracting setting, (2) Dr. Warren would

teach the seminar along with other teachers, and would sit in and listen when other teachers were teaching, (3) the seminar would be taught from the relevant texts, and (4) the examination would be prepared by the instructors and derived from classroom lectures and textbooks. (Pl.'s Mem. [Doc. # 66-1] at 46.) Plaintiff alleges that Defendant failed to comply with these terms. (*Id.*)

The primary evidence of any agreement is an email exchange between Ms. Harris and Dean Kiernan. (*See* Ex. 8 to Aff. of David Golder [Doc. # 55-2].) In an email to Dean Kiernan on May 20, 2011, Ms. Harris stated that she conveyed certain information to Plaintiff that she had discussed with Dean Kiernan, including: (1) that Plaintiff would have extended time to take the exam and that it would be taken in a separate room, (2) that the exam would not use "none of the above" as a possible answer, and (3) that the course would have faculty, including Dr. Warren, giving lectures in their areas of expertise. (*Id.*) Dean Kiernan responded to the email by saying "Thank you." (*Id.*) The threshold question is whether there is sufficient evidence for a reasonable jury to conclude that Plaintiff and Defendant entered into a binding agreement.

It is well-settled in Connecticut that, to form a valid and binding contract, there must be offer, acceptance, and consideration. *Flaherty v. Borough of Naugatuck*, 2007 WL 3121679, at *4 (Conn. Super. Ct. 2007). In addition, there must be "a mutual understanding of the terms that are definite and certain between the parties." *Id.* The email exchange between Ms. Harris and Dean Kiernan may be sufficient evidence for a reasonable jury to conclude that Ms. Harris and Dean Kiernan exchanged an offer and acceptance and reached a mutual understanding of some definite terms on behalf of Plaintiff and Defendant, although the terms set forth in the email do not match all of the terms alleged by Plaintiff. More importantly, however, the email exchange does not give any indication that any agreement was supported by consideration. Although there is an email from Ms. Harris to Plaintiff indicating that Plaintiff would have to pay $50 to take the

course (*see* Ex. 9 to Aff. of David Golder [Doc. # 55-2] ("Dean Kiernan had indicated the course, which would only be $50, would be taught by Dr. Warren"), there is no evidence that the $50 was consideration for the *specific promises at issue*, as opposed to simply the cost of the course itself, which was being offered to other students as well. Thus, the email is not sufficient evidence of consideration as to the specific commitments allegedly made to Plaintiff that went above and beyond simply offering the course.

Finally, there is no evidence in the record that Defendant breached the second and third promises reflected in the email – that "none of the above" would not be a possible answer on the exam and that Dr. Warren and other faculty would teach their areas of expertise. The first promise was just a restatement of the two accommodations Defendant had agreed to make from the outset of Plaintiff's career at Lincoln, and was required to make under the Act (assuming Plaintiff has a disability). A promise to follow the law is not one supported by consideration and thus cannot form the basis of a breach-of-contract claim. *See Jackson v. Water Pollution Control Authority*, 278 Conn. 692, 707 n.13 (2006) ("Generally, a promise to do something which the promisor is already legally obligated to do does not constitute consideration sufficient to support a valid contract." (internal quotation marks omitted)); *Willamette Management Associates, Inc. v. Palczynski*, 134 Conn. App. 58, 72-73 (2012) ("In order for there to be valid consideration, a party must do, or promise to do, something further than, or different from, that which he is already bound to do." (internal quotation marks, ellipses, and brackets omitted)).

Because there is no evidence that the promises as to which there is some evidence of breach were supported by consideration, a reasonable jury could not conclude that the alleged agreement was an enforceable contract. Summary judgment is therefore GRANTED as to Count Five.

### D. Count Six – Intentional Infliction of Emotional Distress

Count Six alleges a claim of intentional infliction of emotional distress ("IIED"). Plaintiff's IIED claim appears to be based on all of the alleged conduct in the case, including Mr. Carta's alleged sexual harassment of Plaintiff.

With respect to the alleged sexual harassment, that conduct cannot form the basis of Plaintiff's IIED claim because it was outside the scope of Mr. Carta's employment. Mr. Carta is not a defendant; as a result, Plaintiff is, in effect, attempting to hold Defendant vicariously liable for an intentional tort committed by Mr. Carta. In Connecticut, "in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business." *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 208 (1990). "Absent special circumstances to show otherwise, sexual harassment and sexual assault are outside the scope of an employee's employment and not in furtherance of the employer's business." *Radesky v. First Am. Title Ins. Co.*, 2003 U.S. Dist. LEXIS 15969 (D. Conn. 2003). There are no facts in the record from which it could be reasonably concluded that Mr. Carta's alleged conduct was within the scope of his employment and in furtherance of Defendant's business. Accordingly, that conduct cannot form the basis of Plaintiff's IIED claim.

With respect to conduct about which Plaintiff testified at her deposition not including the sexual harassment, I find that no reasonable jury could conclude that the conduct was "extreme and outrageous." Simply put, although the alleged conduct may have been unlawful or resulted in "hurt feelings," no reasonable jury could conclude that the conduct meets the high standard of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Appleton v. Bd. of Ed. Of Stonington*, 254 Conn. 205, 211 (2000).  Summary judgment as to Count Six is therefore GRANTED.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 53] is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           June 18, 2014